*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0239P (6th Cir.)
File Name: 01a0239p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

     *v.*

AMOS SEARAN (00-5007) and
JEANETTIA SEARAN
(00-5008/5469),
     *Defendants-Appellants*.

Nos. 00-5007/
5008/5469

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 97-00036—Todd J. Campbell, District Judge.

Argued and Submitted: June 5, 2001

Decided and Filed: July 25, 2001

Before: GUY, BOGGS, and GILMAN, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Paul J. Bruno, Nashville, Tennessee, for Appellant. Robert C. Watson, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Paul J. Bruno, Nashville, Tennessee, David L. Cooper, Nashville, Tennessee, for Appellants. Robert C.

1

Watson, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

BOGGS, Circuit Judge.  On March 19, 1997, a grand jury handed up a 15-count indictment charging Jeanettia and Amos Searan with one count of conspiracy to file a materially false application to participate in the Electronic Filing Program (a violation of 26 U.S.C. § 7206(1)) and conspiracy to assist and advise others in the preparation and presentation of materially false income tax returns (a violation of 26 U.S.C. § 7206(2)), in violation of 18 U.S.C. § 371, and thirteen separate counts of assisting and advising others in filing materially false tax returns, in violation of 26 U.S.C. § 7206(2) and 18 U.S.C. § 2.  On May 3, 1999, a jury convicted both on those fourteen counts.  The district court sentenced Amos to 27 months of imprisonment and two years of supervised release.  The court sentenced Jeanettia to five years of probation, with the first twelve months to be served in home detention with electronic monitoring.  Both defendants timely appealed in Case Nos. 00-5007 (Amos) and 00-5008 (Jeanettia), challenging the sufficiency of the evidence supporting their convictions and certain aspects of Amos's sentence.  The district court subsequently revoked Jeanettia's probation for noncompliance with its conditions and sentenced her to four months of community confinement followed by two years of supervised release.  She timely appealed the revocation order in Case No. 00-5469.  For the reasons set forth below, we affirm the district court's judgments of conviction and sentence as to both defendants and also affirm the revocation of Jeanettia's probation.

district court's order revoking Jeanettia Searan's probation and sentencing her to four months of community confinement followed by two years of supervised release is also **AFFIRMED**.

to order *restitution*, she cites "18 U.S.C. § 3663(a)(B)(I)," by which she apparently means 18 U.S.C. § 3663(a)(1)(B)(i)(II). Jeanettia contends that her probation officer should have worked with her to come up with a feasible payment plan based on her family budget and ability to pay.

As a preliminary matter, the government contended in its brief that this issue would become moot by the time of argument because Jeanettia began serving her four-month term in community confinement while this case was pending on appeal and her release was approaching as the parties filed their briefs, eight months before oral argument. The government has not provided this court with any documentation of the release it anticipated during briefing, nor has it addressed how the district court's sentencing Jeanettia to two years of supervised release under the same conditions as her original probation affects its mootness argument. On the record presently before this court, Jeanettia's appeal in case no. 00-5469 does not appear to be moot.

The statute Jeanettia cites does not require consideration of financial resources in revoking probation for failure to pay for electronic monitoring and failure to pay the special assessment. It instead deals with restitution, which did not factor into the district court's revocation decision. Moreover, as noted above, the district court found that Jeanettia had the financial resources to pay the assessment and cost of monitoring while, in addition, the monitoring device's cost was not the primary reason it had not been installed. Jeanettia has not challenged these factual findings on appeal, and her claim of procedural defect lacks a basis in law. The district court committed no error.

### IV

The district court's judgments of conviction and sentence as to Amos Searan, case no. 00-5007, and Jeanettia Searan, case no. 00-5008, are **AFFIRMED** in all respects. The

### I

Amos Searan and his mother Jeanettia Searan owned and operated Searan's Tax Service, a division of Amos & Company, in the Antioch neighborhood of Nashville, Tennessee. From 1990 to 1993, the Searans prepared and electronically filed individual income tax returns for their clients, which returns omitted income, inflated deductions, and included false forms. In violation of Internal Revenue Service (IRS) regulations, the Searans collected a percentage of the refund amount as their fee, in addition to what they described as "logging" expenses of approximately $150 per taxpayer.

At trial, the administrator of the Electronic Tax Return Program in Tennessee and Kentucky explained how the program works. An Electronic Return Originator ("ERO") enters a taxpayer's data into a commercially available computer software program, then electronically transmits the information via modem to the IRS for processing as a tax return. When the IRS receives the information, it conducts a series of verifications to check for mathematical errors and ascertain whether the social security numbers correspond to those in IRS records. Upon completion of this process, the IRS sends an electronic message back to the ERO reporting that it has accepted the return. The acknowledgment indicates only that the return has successfully completed the initial screening process; it does not state whether the deductions taken on the return are allowable or otherwise appropriate. According to IRS guidelines, the taxpayer must verify and sign IRS Form 8453 after the return has been prepared but before the ERO transmits it electronically. Form 8453 contains a summary of figures on the return and a statement authorizing the ERO to file the return electronically on the taxpayer's behalf. The taxpayer must be given a copy of the prepared return at the time of signature, as well as a copy of the signed Form 8453 upon its completion.

The government does not regulate tax practitioners, who need not be certified public accountants; nor does it evaluate their competence to prepare returns or their familiarity with the tax code. The IRS does, however, screen tax practitioners who want to become EROs and, of course, requires applicants to complete a form. It requires EROs to file their own tax returns on time and will not allow anyone who has been penalized for negligence in the preparation of tax returns to participate in the program. Additionally, people convicted of monetary crimes may not participate. The IRS conducts seminars for tax practitioners who want to become EROs, informing them of the program's benefits and requirements, such as the forms that they must provide to taxpayers. Jeanettia Searan attended one such seminar in 1992.

Lawrence Sweeney engaged Searan's Tax Service in April 1992 to prepare his return for tax year 1991. He met both Amos and Jeanettia and gave them a list of his expenses for 1991. The Searans explained that they knew of deductions other people did not, knew what they described as "industry standard" deductions, had access to IRS archives enabling them to check returns from years past to ascertain whether the taxpayer had additional money coming, and had all of the returns they prepared "pre-audited." They explained their percentage fee and the "logging" fees they charged. They offered that, in addition to preparing Sweeney's 1991 return, they could amend his 1987 return, so he brought them his 1987 receipts. For each of his 1987 and 1991 tax returns, Sweeney paid the Searans $150 as an advance against 20% of his gross return amount. A few weeks later, Sweeney and his wife met with the Searans again to conclude their transaction and obtain copies of their completed returns. Again, the Searans described their returns as pre-audited and based on industry standard deductions. The Sweeneys wrote another check payable to Amos & Company for $300 to cover the "logging fees." Jeanettia showed the Sweeneys their return on a computer screen, scrolling down to the bottom, where it displayed a refund amount of $7324. The Searans explained that the refund would be electronically deposited in the

Pamela Mary Auble, who testified extensively about her evaluation of Jeanettia's intelligence, memory, reasoning capacity, and personality. Dr. Auble testified that Jeanettia's reasoning "seemed to be pretty impaired," her verbal reasoning "was significantly below average," and her full-scale age-adjusted I.Q. of 74, in the fourth percentile of the general population, placed her in the borderline range of functioning. Following this assessment of Jeanettia's intelligence, which barely— if at all— called into question whether her "reason and mental powers are . . . so deficient that [s]he has no will, no conscience, or controlling mental power," *Davis*, 160 U.S. at 484-85, the government asked Dr. Auble to further explain her testimony. Cross-examination revealed that Dr. Auble was "not telling the jury . . . to a reasonable degree of medical and psychiatric certainty, that Ms. Searan is not capable of understanding basic rules," nor was she saying that Jeanettia did not know right from wrong. When asked if Jeanettia was "mentally functioning so that she could tell a lie," Dr. Auble responded, "Well, sure. Is she smart enough to tell a lie? Sure. Almost anybody is smart enough to tell a lie." Dr. Auble further agreed that Jeanettia would know she was telling a lie when she did so. Viewed in full, Dr. Auble's testimony raises little if any doubt as to Jeanettia's ability to form the mental states required by 26 U.S.C. § 7206(2), *i.e.*, willful assistance and knowledge of falsehood. Leaving aside the presumption of sanity, *see Davis*, 160 U.S. at 486, the jury certainly could have found Dr. Auble's spare testimony so overwhelmed by the contrary evidence of Jeanettia's mental functioning as to leave no reasonable doubt that Jeanettia possessed the requisite mental states. The district court therefore properly denied the motion for judgment of acquittal.

Finally, Jeanettia argues that the district court improperly revoked her probation for failure to comply with its conditions, including her not obtaining a monitoring device, when it allegedly refused to consider her ability to pay for the device. For the proposition that courts must consider the financial resources of the defendant in determining whether

has no will, no conscience, or controlling mental power, or if, through the overwhelming violence of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts.'" *See Davis v. United States*, 160 U.S. 469, 484-85 (1895) (quoting and adopting as federal law *Commonwealth v. Rogers*, 7 Metc. 500, 501 (Mass. 1844)). In federal law, the government bears the burden of proving sanity after the defendant affirmatively asserts an insanity defense. *See Davis*, 160 U.S. at 485-86.

FED. R. CRIM. P. 12.2(a) requires a defendant to notify the prosecution of her intention to rely on the so-called insanity defense, and failure to comply with the rule bars raising the defense at trial. Through a series of sealed *ex parte* motions, Jeanettia sought and finally won the district court's permission to file her Rule 12.2 notice late. Although Rules 12.2(a) and (b) require a defendant to file with the clerk of the court a copy of her notice to the government of intent to raise the insanity defense and call expert witnesses in support thereof, the record contains no indication that she ever did so. Nevertheless, the government questioned victims about Jeanettia's apparent capacity to reason and awareness of her acts and surroundings, and Jeanettia called an expert witness. The district court instructed the jury that "Mrs. Searan says that she is not guilty of these charges because her mental deficiency prevented her from acting in a willful and knowing manner. . . . Since it was not her intention to do something which the law forbids, Mrs. Searan submits she is not guilty of these charges." Because the mental disease or defect argument went to the jury and the government has not argued that Jeanettia failed to present it properly below, we will consider her contention that the government failed to prove that she had the mental capacity to form the intent to willfully aid and assist the preparation or presentation of tax returns she knew to be false.

Jeanettia called Vanderbilt University Medical Center neuropsychologist and practicing clinical psychologist Dr.

Sweeneys' bank account and asked Rhonda Sweeney to let them know when it came in so they could collect the remainder of their 20% fee. Before the Sweeneys departed, Jeanettia reported a computer problem that prevented her from printing a hard copy of the return. After several unrequited calls for a paper copy, Lawrence Sweeney finally obtained one by going to the Searans' home and saying he would not leave until he got one. Upon reviewing the entire return, the Sweeneys became concerned, because the amount of their refund nearly equaled the total amount of taxes withheld. They promptly contacted an accountant and asked her to examine the return. The accountant advised the Sweeneys to amend their return to eliminate a number of questionable deductions and deductions without supporting documentation; their amended return showed a tax deficit of approximately $600. The accountant referred the matter to the IRS.

In response, the IRS Criminal Investigation Division began an undercover investigation. On February 19, 1993, Special Agent Doug McEwen, assuming the identity of tax client "Doug Malone," contacted Searan's Tax Service to prepare his 1992 return. He presented fabricated W-2 forms and other supporting documentation that, if properly reported, would have resulted in a small amount of tax due. The Searans produced a return showing a refund of $3683. On April 5, 1993, agents executed a search warrant at the Antioch office of Searan's Tax Service, seizing records relating to 93 false returns prepared for 65 clients, many of whom were audited as a result of the investigation and had to pay unexpected tax liability, sometimes in large amounts.

IRS Revenue Agent Robin Baldwin participated in the audits and interviewed all of the taxpayers whose false returns form the basis of the instant criminal charges. She reviewed the documents connected with each of the taxpayers who testified in this case and explained the appropriate tax calculations. The thirteen tax returns forming the basis of Counts Two through Fourteen all claimed substantial refunds

that, when compared to the proper calculations, resulted in substantial tax deficits properly owed to the government, ranging from $1691 to $7960. The aggregate tax deficiency owed to the government by the taxpayers for whom the Searans prepared and filed returns came to $205,533. Over the years they operated Searan's Tax Service, the Searans received at least $32,379 from taxpayers, which they split evenly.

Amos's base offense level was 14, pursuant to USSG § 2T1.4(a) (1992), which directed application of the § 2T4.1 table for the corresponding tax loss to the government, here $205,533, *see* USSG § 2T4.1(I) (1992).[1] Because Amos committed the offense as part of a pattern or scheme from which he derived a substantial portion of his income, two levels were added, *see* USSG § 2T1.4(b)(1) (1992), and another two were added because Amos engaged in the business of preparing tax returns, *see* USSG § 2T1.4(b)(3) (1992). All counts were grouped pursuant to USSG § 3D1.2(d) (1992), resulting in a combined total offense level of 18, which, in Criminal History Category I, carries a sentence range of 27-33 months. The court overruled Amos's objection to the substantial-portion-of-income enhancement and denied his motion for a minor- or minimal-participant adjustment, *see* USSG § 3B1.2 (1992), finding that he shared the proceeds of the fraud equally with his mother and was "deeply involved" in the offense conduct. The court also denied his motion for a downward departure, finding that Amos's situation was not unusual enough to take it out of the heartland of guidelines cases in the controlling sentence range. The court additionally noted, "In any event, the Court

---

[1] The district court used the version of the United States Sentencing Guidelines effective Nov. 1, 1992, in sentencing Amos because changes to the guidelines effective after completion of the offense conduct raised *ex post facto* concerns. *See* USSG § 1B1.11(b)(1) (1998) (creating an exception to the rule of using the version of the guidelines effective at the time of sentencing).

review the district judge's discretionary refusal to depart downward); *accord United States v. Coleman*, 188 F.3d 354, 357 (6th Cir. 1999) (en banc).

### III. Jeanettia Searan (Case Nos. 00-5008, 00-5469)

Jeanettia Searan argues that the district court erred in denying her motion for judgment of acquittal. The elements of Jeanettia's offenses are set forth above in Part II.A, as is the standard of review applied by this court. Although Jeanettia's appellate brief is cryptic in its brevity, she summarized her primary contention: Her lack of formal training in tax preparation, supposed problems she had in the past with proper completion of tax returns, and her "relatively low" I.Q. of 74 raise "some doubt as to whether [she] fully understood the nature of her actions while preparing and filing tax returns for the various taxpayers whose inaccurate returns led to [her] indictment in this case."

Without citation to authority, Jeanettia claims that her "inferior mental capacity and inability to reason like a normal person, in and of itself, casts [sic] a big shadow of doubt on the element which requires that the crime was committed knowingly and willfully." Thus she seems to claim that her mental functioning was so low that she did not have the capacity to know the tax returns contained falsehoods and that she could not form the intent to willfully aid or assist the taxpayers in preparing and presenting them. She makes these contentions despite volumes of record testimony by victims that she seemed quite alert and knowledgeable of her surroundings and activities when she prepared the tax returns containing material falsehoods.

Evidence of a mental disease or defect is admissible to prove that the defendant did not have the state of mind that the statute makes an element of the crime. "'[I]n order to constitute a crime, a person must have intelligence and capacity enough to have a criminal intent and purpose; and if his reason and mental powers are either so deficient that he

Obviously, application of this guideline requires comparison of his tax-fraud income to his income from other sources. Amos filed no tax returns for the years 1991 and 1992. He called a character witness at his sentencing, who explained that he worked with Amos in a corporation that did business in Tennessee and New York and that he directly employed Amos on certain occasions, paying him in cash (without withholding taxes). The witness could not supply any details concerning how much Amos earned from this corporation or how much he had paid Amos. The probation officer who prepared his Pre-Sentence Investigation Report determined that Amos presented no credible information concerning his earnings for the period in question. The district court found "no evidence in the record that is reliable as to the total income he received in the years in question, outside of the income from the tax business." Because Amos has pointed to nothing in the record concerning any non-tax-fraud sources of income, the district court did not clearly err in its factual findings.

### D. Downward Departure

Amos argues that the district court erred in declining to grant him a downward departure on the basis of his clean criminal record, the non-violent nature of his offense, his employed status, his status as caretaker of his parents, his status as the parent of two minor children, the requirement of immediate restitution, and the alleged facts that the government suffered no actual loss and he "was clearly less culpable tha[n] his co-defendant" mother. As the quotation in Part I shows, *supra* at 6-7, the district court's recognition of its discretion to depart downward from the guidelines range is indisputable. This court has no jurisdiction to review a district court's refusal to depart downward when the court knew of its discretion and declined to exercise it. *See United States v. Dellinger*, 986 F.2d 1042, 1044 (6th Cir. 1993) (a district court's decision that it lacked discretion, as a matter of law, to depart downward was subject to appellate review under 18 U.S.C. § 3742(e)(2), but no jurisdiction existed to

declines to exercise its discretion to depart downward on [the proffered] grounds based on the facts in this case."

Jeanettia's offense-level calculation tracked her son's, but her criminal history score put her in Criminal History Category II. At sentencing, the court granted Jeanettia's motion for a downward departure pursuant to USSG § 5K2.0 (1992) from her guidelines range of 30-37 months' imprisonment (for offense level 18 and Criminal History Category II) to a guidelines range of 6-12 months (for offense level 9 and Criminal History Category II), which, under USSG § 5C1.1(c)(3) (1992), enabled the court to sentence her to five years of probation, with the first twelve months in home detention with electronic monitoring at her expense.

The defendants were each ordered to pay a $700 special assessment, and they were held jointly and severally liable for $24,256 in restitution, representing the percentage fees and logging fees paid by the 51 victims that the government could locate at the time of sentencing. On February 23, 2000, the court issued a summons to Jeanettia to appear for a hearing on noncompliance with the conditions of her probation. At a March 10, 2000, hearing, the court determined that she had failed to pay for her electronic monitoring device, as ordered, and failed to pay her special assessment of $700. The court determined that she had the financial resources to pay the assessment and cost of monitoring and found that the device's cost was not the primary reason it had not been installed. For a grade C violation, *see* USSG § 7B1.1(a)(3)(B) (1992), the court revoked her probation, *see* USSG § 7B1.3(c)(1) (1992), and sentenced her to four months of community confinement and two years of supervised release, *see* USSG § 5C1.1(e)(2), under the same conditions as the previously imposed probation.

## II. Amos Searan (Case No. 00-5007)

### A.  Sufficiency of the Evidence

As to each of the fourteen counts, Amos Searan challenges the sufficiency of the evidence on which the jury convicted him.  On appeal, this court must decide "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989).  This standard applies to both direct and circumstantial evidence, *see United States v. Meyers*, 646 F.2d 1142, 1143 (6th Cir. 1981), and the court will draw all reasonable inferences in favor of the government.  *See United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997); *United States v. French*, 974 F.2d 687, 695 (6th Cir. 1992).

### 1.  Count 1 (Conspiracy to Aid or Assist the Filing of False Returns)

A criminal conspiracy exists when "two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy."  18 U.S.C. § 371.  Conceptually, the federal crime of conspiracy requires proof of specific intent, actual or implied, to violate federal law. *See United States v. Garafola*, 471 F.2d 291, 291 (6th Cir. 1972); *see also United States v. Cangiano*, 491 F.2d 906, 909 (2d Cir. 1974).  Generally, that degree of criminal intent necessary under the substantive count must be proved to sustain a conviction for conspiracy, *see Danielson v. United States*, 321 F.2d 441, 445 (9th Cir. 1963), but as to any circumstances attendant to the crime, the government must prove a mental state no less than knowledge.  *See United States v. Crimmins*, 123 F.2d 271, 273 (2d Cir. 1941) (L. Hand, J.) (explaining that one may be guilty of the strict

the Electronic Filing Program.  He further cites testimony by *some* victims that they were referred to his mother, not him, for tax services; that he was not present or not involved when they gave their tax information to his mother; that his mother, not he, prepared their returns; and that his mother's signature, rather than his, appeared on their tax documents.  Amos's own description of the evidence implicitly acknowledges that some victims came to him for tax services, that he was present (actually, he was quite actively involved, as Rhonda Sweeney's testimony indicated) when some victims supplied their financial information to the tax service, and that he prepared some returns.  Moreover, Amos ignores the volumes of evidence, described above, that he actively participated in the tax fraud scheme and that he admitted splitting the proceeds of the crime *equally* with his mother.  The district court did not clearly err in finding him "deeply involved in the offense conduct."

Amos next objects to the district court's finding that he participated in the tax fraud conspiracy as part of a pattern or scheme from which he derived a substantial portion of his income, which resulted in a two-point offense-level enhancement pursuant to USSG § 2T1.4(b)(1) (1992).  This court reviews a finding of this sort for clear error.  *See United States v. Luster*, 889 F.2d 1523, 1531 (6th Cir. 1989).  The government's evidence showed that he earned $16,190 in gross income from the tax service over an eighteen-month period.  Amos claims that this figure, which averages out to $900 per month in earnings from tax fraud, "in and of itself is insufficient to constitute a finding that [he] derived a *substantial portion* of his income from the tax business."  To the contrary, such a figure is conclusive evidence that he earned a substantial portion of his income from tax fraud if the record also discloses negligible earnings from other sources.  Of course, if he ran a multi-million-dollar carpet cleaning operation on the side, he would not have derived a substantial portion of his income from tax fraud.

20 *United States v.*
*Searan, et al.*

Nos. 00-5007/5008/5469

Nos. 00-5007/5008/5469

*United States v.* 9
*Searan, et al.*

although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)").

The guideline provides: "Based on the defendant's role in the offense, decrease the offense level as follows: (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.  (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.  In cases falling between (a) and (b), decrease by 3 levels." USSG § 3B1.2 (1992).  This guideline "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant."  USSG § 3B1.2, comment. (backg'd) (1992); *see also United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995). "[A] minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal."  USSG § 3B1.2, comment. (n.3) (1992).  As this court has explained, "[a] defendant does not become a minor participant simply because others planned a scheme and made all the arrangements for its accomplishment.  . . .  Although defendant may be less culpable than some of his coconspirators, this does not require a finding that he was *substantially* less culpable than the others." *Miller*, 56 F.3d at 720 (emphasis in original) (citing *United States v. Burroughs*, 5 F.3d 192, 194-95 (6th Cir. 1993), and *Perry*, 908 F.2d at 58).

Amos argues that "[i]t is clear from the record that [he] is substantially less culpable than his mother," such that he deserves at least a two-level minor-role reduction in his offense level.  He adds that the "record further indicates that [he] lacked the knowledge and understanding of the scope and structure of the enterprise being conducted by his mother," meaning he deserves a four-point minimal-role reduction.  In support of these grand contentions, he points out that his mother filed the IRS Form 8633 application to participate in

liability crime of running a traffic light without knowledge of the light's presence in the road but one may be guilty of *conspiracy* to run the light only if he knows the light is there); *see also Ingram v. United States*, 360 U.S. 672, 678 (1959).

The law prohibits assisting others to file false tax returns: "Any person who— (2) Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under . . . the internal revenue laws, of a return . . . , which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person . . . required to present such return . . . shall be guilty of a felony . . . ." 26 U.S.C. § 7206(2).  The elements of this crime are 1) willfully aiding, assisting, procuring, counseling, advising, or causing, 2) the preparation or presentation of a federal income tax return, 3) that contains a statement of any material matter known by the defendant to be false.  *See United States v. Sassak*, 881 F.2d 276, 278 (6th Cir. 1989); *cf. United States v. Morris*, 20 F.3d 1111, 1115 (11th Cir. 1994) (describing the elements of 26 U.S.C. § 7206(1)).

To convict Amos of the conspiracy charged in the indictment, then, the government had to prove 1) that Amos intentionally entered into, 2) an agreement with another, 3) to willfully aid, assist, procure, counsel, advise or cause, 4) the preparation or presentation of a federal income tax return, 5) containing a statement of a material matter Amos knew to be false, and 6) a member of the conspiracy took an overt act in furtherance of the agreement.  Pointing to what he described as evidence that most of the taxpayers went to his mother for assistance in preparing their returns and that he did not personally file the returns, Amos claims that the government failed to prove that he intentionally entered into an agreement to break tax laws or that he had knowledge of the returns' falsity.

To support a conspiracy conviction, the defendant "need not be an active participant in every phase of the conspiracy, so long as he is party to the general conspiratorial agreement."

*United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986). The agreement, intent to join it, and participation can all be inferred from acts done with a common purpose. *See United States v. Hughes*, 891 F.2d 597, 601 (6th Cir. 1989). "Proof of a formal agreement is not required; it must only be proven that the members of the conspiracy had at least a tacit or material understanding to try to accomplish an unlawful goal." *French*, 974 F.2d at 696.

   Amos's depiction of the proof presented at trial is not complete. Most of the taxpayers testified that his name or his business's name (Amos & Company) appeared on their service agreements or fee contracts. Several taxpayers recall either Amos or Jeanettia telling them to make their checks payable to Amos & Company. Other victims remember both defendants being present during meetings with them, and Lawrence Sweeney testified that Amos himself claimed to know of certain deductions most people did not know because his business was similar to Sweeney's. Rhonda Sweeney also met with Amos, and he assured her of his competence in the tax-preparation business by claiming that he had prepared returns for lawyers and others associated with Nashville's Music Row. While Rhonda and Jeanettia Searan sat at a computer terminal preparing her return, Rhonda asked a variety of questions, and on the occasions when Jeanettia was unsure of the answer, she turned to Amos for help before proceeding.   When Lawrence visited the Searans after becoming suspicious, Jeanettia refused to provide him a copy of his return because Amos was not there and he "wouldn't like this." Similarly, when Tammy Garza called asking for copies of her return, Jeanettia explained that she would have to consult Amos. After the IRS informed her that it would conduct an audit, Melissa Gray contacted the Searans, and Amos told her that— for an additional fee— he would explain what they had done with her return; Amos later sent her a letter confirming the substance of their conversation. Janet Dodd also contacted the Searans after being informed of an audit, demanding that they provide her copies of her 1992 return. Amos refused to do so, became increasingly angry on

places so much emphasis, merely describes background facts believed by the grand jury to be true. The crime charged in the indictment nowhere specified that Amos must have filed returns "directly" with the IRS. Instead, it charged Amos with *conspiracy* to "willfully aid and assist in . . . the preparation and presentation to the IRS . . . ." Nothing in the indictment called for proof that he directly filed anything with the IRS. And nothing in the statute calls for such proof, as the elements of the crime, described above, make clear. The district court properly ruled that proof of whether the returns were directly or indirectly filed with the IRS was irrelevant to the charged offense. The proof at trial did not vary from the crime charged in the indictment.

### C. Sentencing

   Amos challenges two aspects of his sentence: the district court's denial of his motion for a minor- or minimal-participant reduction in his offense level and the court's conclusion that he derived a substantial portion of his income from his tax fraud.

   A defendant must prove entitlement to a minor- or minimal-role reduction by a preponderance of the evidence. *See United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990). The culpability determination is "heavily dependent upon the facts," USSG § 3B1.2, comment. (backg'd) (1992), and this court reviews for clear error the district court's findings of fact regarding whether a defendant is entitled to such reduction. *See United States v. Moss*, 9 F.3d 543, 554 (6th Cir. 1993); *United States v. Nagi*, 947 F.2d 211, 214-15 (6th Cir. 1992). For its part, the government draws attention to a colorful description of the clearly erroneous standard: "a decision must strike [the court] as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *Perry*, 908 F.2d at 58; *but see Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985) (reaffirming and explaining the age-old principle that "'[a] finding is "clearly erroneous" when

because Amos's reading of the indictment is flawed. He points to the document's first paragraph, which declares: "At all times material herein, Jeanettia Searan . . . and Amos Searan operated a business of preparing and filing tax returns for taxpayers, utilizing the Electronic Filing Program, whereby they electronically filed tax returns on behalf of taxpayers directly with the Internal Revenue Service (IRS). The defendants operated under the names of Amos & Company, Inc., and/or Searan Tax Service and/or Searans Tax Service and/or Searan's Tax Service." Obviously, Amos attaches great significance to the word *directly*. His error lies in the simple but significant point that this paragraph *does not describe a crime or a criminal charge.*

The indictment described his crime in the succeeding paragraphs, wherein the grand jury charged,

> From on or about the 19th day of November, 1991, up to and including May 14, 1993, in the Middle District of Tennessee, Jeanettia Searan . . . and Amos Searan, the defendants herein, did combine, conspire, confederate and agree together with each other and with diverse other persons to the Grand Jury unknown to commit the following offenses against the United States:
>    To willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the IRS income tax returns, form 1040s, either individual or joint, for taxpayers, which were false and fraudulent as to material matters for the calendar years shown in the tax return, in violation of Title 26 United States Code, Section 7206(2).
>    . . .
>    During the period of the conspiracy the defendants prepared and caused to be filed numerous tax returns including, but not limited to, those returns listed in the overt acts, which contained false items.

These paragraphs state the crime the grand jury charged Amos with committing. The preceding paragraph, on which Amos

the phone, and ultimately sent her a question-and-answer form letter— under Amos & Company letterhead, signed by Amos Searan— on which she was to describe any items that raised questions in her mind. When Linda Freeman contacted the Searans to obtain a copy of her return being audited by the IRS, Amos assured her that all was well, as Amos's attorney was supposedly giving the IRS a hard time and making them mad.

Robert Dowell testified that, when Jeanettia gave him a tour of the Searans' apartment, Amos was in a back room at a computer terminal preparing or transmitting a return. Tiffany Dowell remembered Jeanettia showing her the room Amos worked in and also recalled Amos preparing her fee contract. Both defendants were present when agent McEwen, posing as Doug Malone, met with them at their apartment. At that meeting, Amos explained that he needed to gain an understanding of Malone's business in order to prepare his tax returns. Daniel Hartle dealt only with Amos, who explained that he had taken over his mother's business.

These facts provide more than enough evidence from which a jury could conclude that Amos had intentionally entered into an agreement with his mother to aid or assist others to present materially false tax returns. In this case, the terms of the conspiratorial agreement were that the conspirators would act to make false statements on the returns, which is one of the elements of the offense. From this proof, the jury could conclude that Amos knew at the time he entered into the agreement that any returns ultimately filed in furtherance of the agreement would, in fact, be false. Finally, a legion of witnesses described the Searans' overt acts in furtherance of the conspiracy. The government having presented proof from which a jury could conclude that all of the elements of the crime had been proved beyond a reasonable doubt, the district court did not err in denying Amos's motion for judgment of acquittal on the conspiracy count.

## 2.  Counts 2-14 (Aiding or Assisting the Presentation of False Returns)

The grand jury charged Amos with both the substantive offense of aiding or assisting the presentation of false returns and the accomplice crime of aiding and abetting another to aid or assist the presentation of false returns.  Presented with a special verdict form giving it the option of convicting Amos of either the substantive offense or aiding and abetting the substantive offense, the jury convicted him of the substantive charge, *i.e.*, a violation of 26 U.S.C. § 7206(2).  Amos claims that his acts as proven to the jury do not fall within the ambit of § 7206(2).

As explained above, the elements of this crime are 1) willfully aiding, assisting, procuring, counseling, advising, or causing, 2) the preparation or presentation of a federal income tax return, 3) that contains a statement of any material matter known by the defendant to be false.  Designed to punish tax preparers and others who willfully prepare or present false tax returns on behalf of taxpayers regardless of the taxpayer's knowledge of the falsehood, this statute relies on a theory of liability akin to complicity: it criminalizes an act that facilitates another person's crime when the act is undertaken willfully and with knowledge of the circumstances that make the other person's act illegal.

This court long ago recognized that the "willfully aiding, assisting, procuring, counseling, advising, or causing" language of § 7206(2) effectively incorporates into this statute the theory behind accomplice liability.  In *Sassak*, this court observed that, "[t]heoretically, anyone who causes a false return to be filed or furnishes information which leads to the filing of a false return could be guilty of violating 26 U.S.C. § 7206(2)." *Sassak*, 881 F.2d at 277.  In order to avoid the harsh and probably unintended consequences of such strict liability, *Sassak* followed the Third Circuit in holding that "one must engage in 'some affirmative participation which at least encourages the perpetrator' in order to be guilty of

## B. Variance

"Obtaining a reversal of a conviction because of a variance between the indictment and the evidence requires satisfaction of a [two-part] test:  (1) 'the variance itself must be demonstrated; and (2) the variance must affect some substantial right of the defendant.'" *United States v. Gibbs*, 182 F.3d 408, 428-29 (6th Cir. 1999) (quoting *United States v. Kelley*, 849 F.2d 999, 1002 (6th Cir. 1988)).  A variance occurs when the evidence at trial proves facts materially different from the facts alleged in the indictment, thus creating a substantial likelihood that the defendant may have been convicted of an offense other than that charged by the grand jury. *See United States v. Manning*, 142 F.2d 336, 339 (6th Cir. 1998).  The defendant bears the burden of proving the existence of a variance and that such variance affected his substantial rights or rose to the level of a constructive amendment of the indictment. *See United States v. Blanford*, 33 F.3d 685, 701 (6th Cir. 1994).  "Substantial rights . . . are affected only when a defendant shows 'prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *United States v. Hathaway*, 798 F.2d 902, 911 (6th Cir. 1986) (quoting *United States v. Miller*, 471 U.S. 130, 138 n.5 (1985)).  Reversal is not necessary if the variance is harmless insofar as the indictment fully and fairly informed the defendant of the charges he had to answer at trial. *See United States v. Hunstman*, 959 F.2d 1429, 1435 (8th Cir. 1992).  This court reviews de novo whether there was an amendment to or variance from the indictment. *See United States v. Prince*, 214 F.3d 740, 756 (6th Cir. 2000).

Amos claims that the indictment charged him with filing tax returns *directly* with the IRS.  The theory of his defense, he claims, was to demonstrate his innocence by showing that he never filed a tax return *directly* with the IRS.  He is correct in asserting that no proof at trial showed that he filed a tax return on behalf of anyone listed in the indictment *directly* with the IRS.  But this fact is of no legal consequence,

the proceeds with her.  These acts, willfully undertaken by Amos, contributed to the execution of the crimes.  *See Phillips*, 664 F.2d at 1010.  From this evidence a jury could therefore properly conclude that he, by affirmative overt acts, willfully aided, assisted, procured, counseled or caused either his mother or the taxpayers to prepare or present each of the tax returns specified in Counts 2-14 of the indictment.

The record also contains sufficient evidence to show that Amos knew the returns filed contained false statements of material fact.  Each of the filings occurred in a span of time when he continually lent support to his mother's criminal activity and occasionally engaged in his own criminal aiding and assisting.  Additionally, Amos's knowledge of and participation in the conspiracy to assist others in filing false returns and his aiding his mother to file returns that she knew contained falsehoods provide evidence from which a jury could conclude that Amos engaged in his contributing acts while knowing that the returns ultimately filed would contain false statements of material fact.  "The fact that some of th[is] evidence may have served double duty by also supporting the charge of conspiracy is of course immaterial." *Nye & Nissen*, 336 U.S. at 619. Because the government presented evidence that Amos engaged in his contributing acts while knowing that returns ultimately filed with his aid and assistance would contain false statements of material fact, the government did not have to prove that he knew of any particular false statements on the returns specified in the indictment.  His mental state (knowledge of the falsehood) is relevant only at the time he gave his aid and assistance, and the evidence described above permitted the jury to conclude that he had the requisite knowledge of falsehood.  This knowledge flows to any returns the preparation or presentation of which he aided, assisted, procured, counseled, or caused.

Because this circumstantial evidence could lead a jury to find each of the elements of Counts 2-14 proven beyond a reasonable doubt, the district court properly denied Amos's motion for judgment of acquittal.

aiding in the preparation and presentation of false tax returns." *Ibid.* (quoting *United States v. Graham*, 758 F.2d 879, 885 (3d Cir. 1985)).  *Sassak* explained: courts should "analyze violation of 26 U.S.C. § 7206(2) in terms of an actor's actual willfulness and knowledge of the falsity of the return that is prepared." *Sassak*, 881 F.2d at 278.  *Sassak* thus interpreted § 7206(2) as incorporating the complicity theory of criminal liability set forth more fully in 18 U.S.C. § 2 and its interpretive jurisprudence.  We reaffirm that principle today and look to 18 U.S.C. § 2 caselaw for an understanding of what Congress criminalized with the inclusion of the 'aiding, assisting, procuring' language in 26 U.S.C. § 7206(2).

The recognition that the first element of a § 7206(2) charge effectively incorporates "aiding and abetting" complicity liability means that charging a defendant with "aiding and abetting," under 18 U.S.C. § 2, the "aid[ing], assist[ing], procur[ing] . . ." of false tax returns, under 26 U.S.C. § 7206(2), is a redundancy.  Conceptually, a complicitous defendant like Amos could "aid and abet" a principal like his mother in her endeavor to "aid, assist, procure . . . ." Yet the latter language, adapted from § 7206(2), contains no limitations on whom the defendant aids, assists, or procures.  Accordingly, we hold that the broad language of § 7206(2) reaches far enough to cover the acts of a defendant who aids, assists, or procures another person to aid, assist, or procure the filing of a false return.  That is, § 7206(2) treats Amos's activities in aiding or assisting his mother as merged with his mother's, which obviates the need for a grand jury to add 18 U.S.C. § 2 to an indictment.  Of course, Congress's incorporation of traditional complicity liability into § 7206(2) means that the principles underlying aiding and abetting liability also underlie § 7206(2) charges, and trial courts should turn to 18 U.S.C. § 2 jurisprudence in explaining § 7206(2) charges to defendants and juries.

"Whoever . . . aids, abets, counsels, commands, induces or procures [the] commission [of an offense against the United States], is punishable as a principal.  Whoever willfully

causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(a), (b). Judge Learned Hand read this complicity statute to require that the defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938). Judge Hand's formulation became the accepted standard for imposing accomplice liability under 18 U.S.C. § 2. *See Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949); *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir. 1992) (en banc). "In order to prove association there must be evidence that the defendant shared the criminal intent of the principal, while in order to prove participation there must be evidence that the defendant committed some overt act designed to aid in the success of the criminal venture. Aiding and abetting has two components: an act on the part of a defendant which contributes to the execution of a crime and the intent to aid in its commission." *United States v. Phillips*, 664 F.2d 971, 1010 (5th Cir. Unit B Dec. 1981) (internal quotation omitted); *accord United States v. Dolt*, 27 F.3d 235, 238 (6th Cir. 1994); *Morei v. United States*, 127 F.2d 827, 830 (6th Cir. 1942) (explaining the former distinction between aiders and abettors— those present and assisting in commission of the crime— and accessories before the fact— those counseling, encouraging, or inciting its commission but not present); *but see Colosacco v. United States*, 196 F.2d 165, 167 (10th Cir. 1952) (recognizing that, under the revised U.S. Code, the distinction was abandoned).

"'Knowledge that a crime is being committed, even when coupled with presence at the scene, is generally not enough to support a conviction on the basis of aiding and abetting.'" *United States v. Bryant*, 461 F.2d 912, 920 (6th Cir. 1972) (quoting *United States v. Garguilo*, 310 F.2d 249, 253 (2d Cir. 1962)). The government must prove that the aider/abettor had the same mental state as that necessary to

convict a principal of the offense. *See United States v. Loder*, 23 F.3d 586, 591 (1st Cir. 1994) (collecting cases).

The government's theory of Amos's liability in this case holds that he aided or assisted either taxpayers or his mother to file tax returns that he knew contained a false statement of material fact. Therefore, the government had to prove that Amos 1) by some affirmative overt act, 2) intentionally aided, assisted, procured, counseled, or caused, 3) his mother or a taxpayer, 4) to prepare or present a federal income tax return, 5) containing a statement of a material matter that Amos knew to be false. As to each of the thirteen substantive counts, Amos claims that the government introduced no proof that he aided and assisted the filing of false tax returns, citing evidence that Jeanettia prepared and signed most of the returns in question and sometimes spoke to the taxpayers out of his presence. As to Counts 4 and 5 (the returns of the Barabashes), Amos claims the government produced no evidence that he knew the Barabashes' return contained a false statement; he makes essentially the same claim as to Count 7 (return of Ms. Freeman), Count 8 (return of Mr. Baggett), Count 11 (return of Ms. Minton), and Count 14 (return of "Doug Malone"). As to Counts 9 and 10 (returns of Mr. Hartle), Amos admits preparing tax documents later audited by the IRS but disclaims knowledge of any falsehood appearing on them.

The evidence described above with respect to the conspiracy charge indicates that Amos was not merely present at the scene of his mother's activities assisting taxpayers. Rather, he actively participated in her criminal acts by assuring victims of his and his mother's competency to file tax returns, particularly returns containing allegedly legitimate "deductions" known to few other people. He personally prepared certain tax returns for Searan's Tax Service and at various times held himself out as a partner in, proprietor of, and successor to his mother's tax-preparation operation. And he received payment from the victims on behalf of the business he jointly operated with his mother, evenly splitting