**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0550n.06
Filed: August 2, 2006

No. 05-5257

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **ON APPEAL** FROM THE |
| **Plaintiff-Appellee,** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| ROEL GOMEZ, | ) | **O P I N I O N** |
| | ) | |
| **Defendant-Appellant.** | ) | |

**BEFORE: MARTIN, NORRIS, and McKEAGUE, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.** After a four-day trial, a jury returned guilty verdicts on all three counts of a second superseding indictment that charged defendant Roel Gomez with cocaine trafficking, 21 U.S.C. § 841(a)(1), soliciting the murder of a former associate in order to prevent the communication of information relating to the possible commission of a federal offense to a law enforcement officer or judge of the United States, 18 U.S.C. § 373, and money laundering, 18 U.S.C. § 1956(a)(1). On appeal, defendant raises a number of issues, ranging from the denial of his motions to suppress to the reasonableness of his sentence. For the reasons that follow, we affirm both defendant's conviction and sentence.

### I.

According to his trial testimony, Thomas Richardson, a drug trafficker in Nashville, began to purchase cocaine and marijuana from defendant in 2001. He had already had drug dealings with defendant's associate, Santiago Franco, also known as "Chaho."

Richardson had been serving a nine-month sentence for drug trafficking when released in 2001. He was contacted by Franco who sought repayment of a drug debt and a resumption of their prior business relationship. As a partial payment of the debt, Richardson testified[1] that Franco told him to give $25,000 and a Rolex watch worth between $30,000 and $40,000 to defendant.

Thereafter, Richardson resumed his drug-dealing with Franco. Initially, Franco "fronted" Richardson five to ten kilograms of cocaine. Richardson would sell the drugs and then Franco, defendant, and a third individual known as "Betho" would pick up the proceeds. By the middle of 2002 Richardson testified that "I started receiving larger amounts . . . from 20 to 50 kilos at a time and several hundred pounds of marijuana, 500 hundred to close to around 1,000 at a time." When asked about defendant's role in the operation, Richardson stated that defendant did "a lot of overseeing, meaning counting money at times and letting me know that – calling me back, letting me know that money was short . . . basically just doing a lot of overseeing over the whole organization."

During the course of 2002, the relationship between Franco and defendant began to alter. Franco was not always able to deliver drugs as promised and Richardson learned that Franco "owed a drug debt and that him and Gomez had confusion about money or some partial of some drugs or whatever." After Richardson expressed reservations about Franco, defendant promised Richardson that things would improve and that he would arrange the deals. These deals started out at 30 kilograms of cocaine but "the quantity grew larger every time."

---

[1] At the time of trial, Richardson had already entered into a plea agreement that included the potential of a U.S.S.G. § 5K1.1 downward departure based upon substantial assistance.

Defendant told Richardson that the drugs were arriving by commercial vehicles and Richardson, in turn, would loan cars to defendant to pick the drugs up when they arrived. Rather than use motel rooms to store the drugs as in the past, Richardson and the defendant used two houses in Nashville, one at 510 Lou Court and the other on Cedar Valley Drive. Defendant would often stay at the residences to "babysit" the drugs.

In addition to defendant, Richardson mentioned that another individual named Mick would watch over the money at the Cedar Valley residence. Mick worked for the "boss" in Mexico, who was known as "Twenty-One." At trial, Richardson identified a picture of one Alfredo Quiroz as the man he knew as Mick.

However, things began to unravel in March of 2003 when Nashville police officers made several controlled drug buys from Clayton Richardson, Thomas's brother. While conducting surveillance, officers observed Clayton and the girlfriends of the Richardson brothers at the Lou Court house.

Eventually, a search warrant was obtained and the house was searched on June 12, 2003. Cocaine base, drug paraphernalia, guns, and ledgers were seized. The ledgers recorded drug transactions between the Richardson brothers and defendant. The same day officers executed a search warrant at 453 Cedar Valley Drive; firearms, drug paraphernalia, and related paperwork were recovered.

The next day, police arrested a number of individuals, including Thomas Richardson and Santiago Franco. Richardson began cooperating with authorities and placed recorded calls to his former business associates, including defendant. On June 18, 2003, a monitored meeting occurred

between Richardson and defendant. During the meeting, defendant told Richardson that there were 75 kilograms of cocaine on a tractor trailer due to arrive in Nashville. Defendant also spoke about the recent arrest of Franco. Defendant was worried that his former colleague might begin cooperating with the government and, to prevent this possibility, he told Richardson, "We got to kill him, man. Five Gs, I offer whoever takes his life." At about midnight the same day, Richardson met again with defendant, who was convinced that Franco was "ratting me out" and must be killed. Because Franco was known as "Chaho," defendant spelled out his last name so there was no mistake about his identity.

The next evening, defendant called Richardson and told him to be in the area of his residence in about an hour. Officers established surveillance of both defendant and his residence. Later that evening, they watched defendant leave in a white Ford F-150 pick-up truck with a temporary tag issued from Auto Trend, Inc. Defendant drove to TSI Trucking, where officers believed he was meeting the tractor trailer to pick up the shipment of cocaine. Defendant only stayed a few minutes and then left. Officers then instructed Richardson to call and ask if he had the cocaine. Defendant replied that he did.

Defendant was then arrested. However, in the course of the arrest, he rammed a police car and then attempted to flee on foot. When his vehicle was searched, approximately 75 kilograms of cocaine – with a street value of $18,000,000 – were found. After his arrest, defendant made certain incriminating statements, which will be discussed below, that he later sought to suppress.

With respect to the money laundering count, officers later executed a search warrant at Auto Trend, Inc., of Nashville where defendant had purchased with alleged drug proceeds several vehicles that he used to advance his trafficking operations.

**II.**

**A. Motions to Suppress**

Defendant filed two motions to suppress evidence. The first sought suppression of the cocaine seized from his pick-up truck on the night of his arrest; the second sought suppression of inculpatory statements made to police officers after his arrest. The district court held a hearing, after which it denied the motions. When reviewing a district court's denial of a motion to suppress, we review factual findings for clear error and legal conclusions *de novo*. *United States v. Abboud*, 438 F.3d 554, 568 (6th Cir. 2006) (citing *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004)).

1. Suppression of Cocaine

Two Metropolitan Nashville Police Department officers, Jessie Burchwell and Troy Donegan, testified at the suppression hearing. Their testimony largely tracked the factual recitation presented earlier. At the close of the hearing, the district court denied the motion to suppress the cocaine based on the following reasoning:

> Defendant had been arrested. He could have been arrested for a variety of crimes at that point. Probable cause certainly existed for the arrest for, first of all, possession of a large quantity of cocaine. . . . The Government agents had been working with an informant for several days. . . .
>
>      . . . .

> So at that point, they had probable cause to arrest him for possession of cocaine and conspiracy. . . . The officers cornered the Defendant's vehicle when he stopped for a stop light. . . .
>
> At that point he rammed the car in front of him and the car behind him, full knowing that these were officers attempting to apprehend him. So at that point we have assault on an officer, another crime that has been committed right in the presence of the officers who luckily escaped injury. . . .
>
> . . . .
>
> . . . The Defendant was properly under arrest and under . . . the *Thornton* decision from the Supreme Court in May of this year, as a recent occupant of the vehicle, the search of the vehicle would have been justified.

Although not addressed by defense counsel, the district court correctly recognized that

*Thornton v. United States*, 541 U.S. 615 (2004), controls the resolution of this issue. In *Thornton*,

the Supreme Court extended the authority to search to situations in which the person arrested is no

longer the occupant of the vehicle subject to search:

> In *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), we held that when a police officer has made a lawful custodial arrest of an occupant of an automobile, the Fourth Amendment allows the officer to search the passenger compartment of that vehicle as a contemporaneous incident of arrest. We have granted certiorari twice before to determine whether *Belton's* rule is limited to situations where the officer makes contact with the occupant while the occupant is inside the vehicle, or whether it applies as well when the officer first makes contact with the arrestee after the latter has stepped out of his vehicle. We did not reach the merits in either of those two cases. *Arizona v. Gant*, 540 U.S. 963, 124 S.Ct. 461, 157 L.Ed.2d 308 (2003) (vacating and remanding for reconsideration in light of *State v. Dean*, 206 Ariz. 158, 76 P.3d 429 (2003)); *Florida v. Thomas*, 532 U.S. 774, 121 S.Ct. 1905, 150 L.Ed.2d 1 (2001) (dismissing for lack of jurisdiction). We now reach that question and conclude that *Belton* governs even when an officer does not make contact until the person arrested has left the vehicle.

541 U.S. at 617. This court has affirmed the denial of a motion to suppress based upon *Thornton*,

*see, e.g., United States v. Herndon*, 393 F.3d 665, 668 (6th Cir.), *vacated on other grounds and*

*remanded for resentencing*, 125 S.Ct. 2279 (2005), and we now do so again.

2. Suppression of Post-Arrest Statements

According to the testimony of Officer Donegan, when transporting defendant to the federal

courthouse on the day after his arrest, defendant "began to talk about Franco Santiago, another

Defendant in another drug case, stating that he wanted the same deal that Franco got. He also said

that Franco had burned up Nashville, or had set Nashville afire, and that anything that Franco had,

he had actually gotten from him, meaning Mr. Gomez. And that Franco worked for Gomez."

Donegan went on to state that the statements were "unsolicited" and that neither he nor Officer

Burchwell responded to defendant.

After hearing testimony, the district court denied defendant's motion to suppress post-arrest

statements for the following reasons:

> In terms of the statements made by the Defendant, the Court finds as follows. The Defendant was given his *Miranda* rights upon his arrest, in the late evening hours of June 19. He chose not to speak at that time. The Government is not relying upon any of those statements in this case because there weren't any statements. The statements were made the next day, when sometime between 8:00 and 9:30 or 10:00, Officer Burchwell and Officer Donegan . . . went to the Criminal Justice Center to bring the Defendant over for booking on the Federal charges to the Federal Courthouse.
>
> No additional *Miranda* warnings were given at that time because the officers did not intend to question the Defendant, and the Court finds in fact the officers did not question the Defendant.
>
> The Court finds that upon approaching the Federal Courthouse and the loading dock . . . that the Defendant voluntarily made incriminating statements that

were not elicited, either by interrogation by the officers or by talking among the officers, designed or not, to elicit some kind of a response from the Defendant.

The Court finds under the totality of the circumstances and by a preponderance of the evidence, that these statements were voluntary by the Defendant. They were made in his own interest. He was seeking a deal and that Mr. Franco, in fact, was the person who was turning him in to the authorities. But the Court finds those were voluntary statements and that *Miranda* does not in any way exclude those statements.

Defendant contends that the inculpatory statements given after his arrest were involuntary and thus violated *Miranda v. Arizona*, 384 U.S. 436 (1966). However, defendant did not testify at the suppression hearing and the testimony of the officers supports the district court's conclusion that the statements were made without the encouragement of either of them, a finding that we review for clear error. Finding none, we affirm the district court.

**B. Introduction of Firearms Evidence**

Prior to trial, defendant filed a motion *in limine* to exclude introduction of evidence relating to a "gun that was recovered from a vehicle subsequent to the arrest of the Defendant." According to defendant's motion, introduction of the firearm would be used primarily to call his character into question in contravention of Fed. R. Evid. 404(b). It also noted that defendant had not been charged with possession of a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c).

At the pretrial conference, the district court made the following observations:

And the other [motion] about guns, this objection is . . . based on [Rule of Evidence] 404, and other than the guns are generally admissible in drug trials, [the AUSA] says that the defendant's knowledge that the informant possessed multiple firearms supports his knowledge that the informant was a drug dealer which is relevant to the money laundering charge, which makes sense to me. And then the fact that he was

soliciting the informant who he knew to be an armed drug dealer to have a potential witness killed also helps demonstrate the seriousness of his intent.

So that all makes a lot of sense to me. What do you have to say about his response?

DEFENSE COUNSEL: That does make a lot of sense. And if that's . . . how the proof in this case goes, then there may be a reason for that to come in.

Although the motion *in limine* sought exclusion only of the firearm seized from defendant's pick-up truck on the night of his arrest, at trial defense counsel also objected to the introduction of evidence during Officer Burchwell's testimony of a MAC-11 seized at the Cedar Valley Drive address. The district court denied the objection but told counsel, "I'm just going to instruct the jury at this time we are hearing about searches but there's no connection at this time to this defendant."

In a similar vein, defense counsel objected when Richardson mentioned the MAC-11 and a .40 caliber Glock left at the Cedar Valley address. According to Richardson, "I would leave [defendant] with the guns basically. He would want the gun there for protection use."

As part of its instructions, the district court told the jury: "You have heard testimony that the defendant committed some acts other than the ones charged in the indictment. You cannot consider this testimony as evidence that the defendant committed the crimes that he's on trial for now."

This court recently reiterated the manner in which we review admission of evidence pursuant to Rule 404(b):

> First, we review for clear error the district court's factual determination that sufficient evidence exists that the other acts occurred. Second, we review *de novo* whether the district court correctly determined that the evidence was admissible for a legitimate purpose. Third, we review for abuse of discretion the district court's determination that the "other acts" evidence is more probative than prejudicial under Rule 403.

*United States v. Matthews*, 440 F.3d 818, 828 (6th Cir. 2006) (citing *United States v. Comer*, 93 F.3d 1271, 1277 (6th Cir. 1996)).

Turning to the issue before us, we note that each of the three charged counts requires proof of some element of intent. Second, firearms are considered "tools of the drug trade" and, as such, are admissible in drug trafficking trials even if no firearms charge has been alleged. *See United States v. Ware*, 161 F.3d 414, 417-18 (6th Cir. 1998). Third, Richardson testified that he, not defendant, owned the guns in question, lessening the danger of unfair prejudice. And, fourth, the limiting instructions mentioned above properly guided the jury in the manner in which it weighed this evidence. Given these considerations, we affirm the decision of the district court to permit the introduction of evidence of the firearms at trial.

## C. Summary of Recorded Conversations

As mentioned earlier, during their investigation of defendant, law enforcement agents arranged for certain conversations between Richardson and defendant to be recorded. During trial, Officer Burchwell was asked to summarize what he heard during one conversation. Defense counsel objected on the ground that the tapes would later be introduced at trial. The AUSA responded, "I'm not asking what's on the tape. I'm asking what he heard, so the best evidence rule does not apply." The district court overruled the objection and Officer Burchwell recounted the terms of a pending drug transaction.

Federal Rule of Evidence 611(a) provides as follows:

The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless

consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Fed. R. Evid. 611(a). A trial court's control over the order and nature of evidence is reviewed for abuse of discretion. *Argentine v. United Steelworkers of America*, 287 F.3d 476, 486 (6th Cir. 2002).

We begin by noting that the tapes were played while Officer Burchwell was testifying, not at a point much later in the trial. His testimony merely provided context based upon his personal knowledge of what occurred. Moreover, because the recordings were played in their entirety, Federal Rule of Evidence 1006, which governs the summary "voluminous" materials, is not apposite.

The district court did not abuse its discretion in permitting this testimony.

**D. Variance in the Indictment**

Defendant contends that, because the second superseding indictment charged him with possession of "about seventy-five kilograms of . . . cocaine," and Tennessee Bureau of Investigation Agent Glenn testified at trial that the cocaine – not including its packaging – weighed 71.9 kilograms, the entire count should be dismissed because of the "variance in the indictment." Typically, this court reviews whether a variance exists *de novo*. *United States v. Searan*, 259 F.3d 434, 446 (6th Cir. 2001). However, because defendant did not raise this issue below, we review for plain error. Fed. R. Crim. P. 52(b).

As defendant concedes, reversal based upon a variance in the indictment is only required when it affects his "substantial rights" or otherwise impacts his ability to defend himself. *See United*

*States v. Hart*, 70 F.3d 854, 860 (6th Cir. 1995) ("When a Defendant argues a 'fatal' or 'material' variance, he must demonstrate that the variance prejudiced 'substantial rights' and that the variance took the Defendant by surprise or placed him at risk of double jeopardy."); *United States v. Feinman*, 930 F.2d 495, 499 (6th Cir. 1991) ("Not every variation between indictment and proof at trial creates reversible error; only those variances that create 'a substantial likelihood' that a defendant may have been 'convicted of an offense other than that charged by the grand jury' require reversal."). Moreover, "[t]he defendant bears the burden of proving the existence of a variance and that such variance affected his substantial rights or rose to the level of a constructive amendment of the indictment." *Searan*, 259 F.3d at 446.

Defendant fails to explain how the slight variance between the quantity of drugs charged and the amount introduced at trial was either "material" or "prejudicial" to his defense. Certainly it would not have "taken him by surprise" thereby affecting his trial strategy. Particularly in light of the fact that we are reviewing for plain error, we conclude that defendant failed to carry his burden with respect to this issue.

**E. Alleged Hearsay Statement**

As mentioned briefly earlier, the third count of the indictment, which charged defendant with money laundering, was premised upon his purchase of a 2000 Chevrolet Tahoe from Auto Trend, Inc., of Nashville with proceeds derived from drug trafficking. Mohsen Ghiassi, who testified for the government, sold the vehicle in question to defendant. Naji Saleem worked at a nearby dealer named U.S. Auto and testified that he knew both Ghiassi and defendant.

Saleem began by explaining that he worked in a neighboring car lot and came to know

defendant when he purchased a car from him for $7,500 in cash. He went on to state that defendant

bought several cars from Ghiassi. In the course of his testimony, the following exchange occurred:

AUSA:        During the course of these purchases [by defendant from Ghiassi],
did Mr. Ghiassi ever tell you anything about how he's feeling about
the defendant?

Defense Counsel: Your Honor, object to what Mr. Ghiassi said.

AUSA:        Prior consistent statement. [Ghiassi's] credibility has been attacked.

Court:        Overruled.

Saleem:        Toward the last vehicle, toward the end of it, the last vehicle that he was
purchasing . . . Mr. Ghiassi wasn't feeling comfortable, and he mentioned to
me that he doesn't want to buy any of those vehicles anymore.

             . . . .

At the beginning, he told me that he wasn't feeling comfortable. Then later
on he told me that [defendant] mentioned to something to him about, you
know, having to purchase the car for him or something bad might happen to
the business or . . . to him, or something like that.

Defendant contends that Saleem's testimony was offered for the truth of the matter asserted

and therefore constitutes improper hearsay. Fed. R. Evid. 801(c). However, Fed. R. Evid.

801(d)(1)(B) provides in part that a statement is not hearsay if "[t]he declarant testifies at the trial

. . . and is subject to cross-examination concerning the statement, and the statement is . . . consistent

with the declarant's testimony and is offered to rebut an express or implied charge against the

declarant of recent fabrication or improper influence or motive . . . ." Like the majority of the

circuits, we permit the introduction of prior consistent statements by a third party so long as the

other requirements of Rule 801(d)(1)(B) are satisfied. *See United States v. Hebeka*, 25 F.3d 287, 292 (6th Cir. 1994).

In this case, Ghiassi testified and was subject to cross-examination. Among other things, he acknowledged that he had not been entirely truthful when speaking to government officials in his initial interview and had agreed to plead guilty to failure to file reports of cash received in trade. He attributed his deception to concern for his family: "I [was] scared if I say something they are going to hurt my family." He went on to mention that defendant threatened another man's family in his presence and that these threats, though not directed at him, scared him.

On cross-examination, defense counsel asked Ghiassi if he would avoid jail time by pleading guilty and whether he lied to the FBI. Counsel also asked, "Are you saying . . . that between the first interview and the second interview you somehow began to change the truth because you were somehow scared for your family. Is that correct?"

In our view, the requirements of Rule 801(d)(1)(B) have been satisfied. First, both Ghiassi and Saleem were subject to cross-examination. Second, defense counsel implied that Ghiassi's testimony was recently fabricated to avoid prison. Third, Saleem's statement about being "scared" was consistent with Ghiassi's testimony. And, fourth, the statement Saleem attributed to Ghiassi was made before his contact with the FBI, which defense counsel implied provided the motivation to lie.

**F. Disputed Testimony Regarding the Taped Conversations**

Defendant also takes issue with the fact that the district court permitted the government to play portions of the taped conversations between Richardson and himself a second time. As already

mentioned, the tapes were originally introduced and played during the testimony of Officer

Burchwell, who prefaced their playing by summarizing their content. Later, Thomas Richardson

was called to testify as the government's final witness. Noticing that audio equipment had been

brought into the courtroom, defense counsel objected to any replaying of the tapes. When asked,

the AUSA explained that he wanted to play portions of the tapes so that Richardson "could talk

about what he is talking about there."

Richardson proceeded to testify and, after discussing other matters, he was given transcripts

of the recorded calls and asked about them. Portions of the recordings were then played and

Richardson was asked to identify the voices and explain the gist of certain conversations.

In *United States v. Martin*, 920 F.2d 393 (6th Cir. 1990), we provided the following guidance

concerning testimony about audiotapes:

> First, the conversation on the tape was between the defendant and a testifying
> witness and was introduced while the witness was on direct examination. Under such
> circumstances the witness, if the prosecutor asks, is free to first describe the
> conversation in his own words and indicate what was said and what occurred. The
> tape may then be played as corroboration. *If the tape is played first, however, it does
> not mean that a party to that conversation is thereby prohibited from testifying
> relative to the event.*

*Id.* at 397 (footnote omitted) (emphasis added).

We begin by noting that Richardson's testimony helped to explain specific portions of the

conversations that contained terms of art with respect to drug-trafficking. For instance, Richardson

testified that the words "birds" and "bricks" referred to kilograms of cocaine; that his "uncle" was,

in fact, the trucker transporting the drugs; and that defendant's comment, "the best way not to catch

a case is to pop him inside," meant that Franco should be killed while incarcerated. Furthermore,

because it was different in scope and focus than Officer Burchwell's testimony, which merely gave a general sense of the setting in which the tapes were recorded, their use during Richardson's appearance was not merely cumulative.

The district court expressed its awareness of the potential danger of cumulative evidence and instructed the government to play only selected portions of the tapes, which it did. Accordingly, the danger of unfair prejudice was minimized. We affirm the district court on this point for those reasons.

**G. Sufficiency of the Evidence**

Defendant contends that the evidence was constitutionally insufficient to support his conviction on Count II of the indictment, which charged him with violating 18 U.S.C. § 373. Specifically, the second superseding indictment reads as follows:

> On or about June 18, 2003, in the Middle District of Tennessee, the defendant, ROEL GOMEZ, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, did solicit, command, induce, and endeavor to persuade another person to engage in such conduct, that is to unlawfully kill and murder . . . Santiago Franco, a human being, with malice aforethought, with intent to prevent the communication by such person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(a)(1)(C).

> In violation of Title 18, United States Code, Sections 373 and 2.

The statute of conviction makes it a crime to recruit another person to "engage in conduct constituting a felony that has as an element the . . . threatened use of physical force . . . against the person of another in violation of the laws of the United States, and under circumstances strongly

corroborative of that intent, solicits . . . or otherwise endeavors to persuade such another person to engage in such conduct . . . ." 18 U.S.C. § 373(a). For its part, 18 U.S.C. § 1512(a)(1)(C) makes it a crime to "attempt to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States information relating to the commission or possible commission of a Federal offense . . . ."

This court "reviews a sufficiency of the evidence claim *de novo*, considering 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Ostrander*, 411 F.3d 684, 690-91 (6th Cir.), *petition for cert. denied*, 126 S.Ct. 469 (2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Defendant takes the position that the government failed to produce evidence that he believed Franco might communicate with federal authorities or that he knew of an ongoing federal investigation when he solicited Richardson to murder Franco. The government counters that the conversation taped on June 18, 2003 includes defendant telling Richardson, "Five Gs, I offer whoever takes his life." Defendant repeated this wish several times, telling Richardson "for us not to catch a case is to pop him inside. . . . Just offer those 5 Gs whoever's inside." With respect to the requirement of § 1512(a)(1)(C) that the killing be with the intent to "prevent the communication by any person to a law enforcement officer . . . of the United States of information relating to the commission . . . of a Federal offense," in one of their recorded conversations defendant told Richardson that he knew of a list maintained by the federal Drug Enforcement Agency that

contained Franco's name. In short, defendant knew that a federal drug investigation was afoot that involved the very man he sought to kill.

A defendant raising a sufficiency of the evidence challenge "bears a heavy burden, as we view the evidence in the light most favorable to the prosecution." *United States v. Jefferson*, 149 F.3d 444, 445 (6th Cir. 1998) (rejecting such a challenge in a § 1512(a)(1)(C) prosecution). Defendant's comments to Richardson about eliminating Franco were repeated on more than one occasion and defendant admitted that he had discussed the subject with his mother, who agreed that Franco must be killed. He also went so far as to spell out Franco's name for Richardson to avoid mistakes. The jury apparently took these statements at face value and, given that the charge was soliciting a murder, this finding, coupled with defendant's knowledge that a DEA investigation was afoot, is constitutionally sufficient to support his conviction.

## H. Lesser Included Offense

Defendant mounts a second challenge to his § 373 conviction, arguing that the district court should have instructed the jury to consider whether he violated 18 U.S.C. § 1512(b)(3) rather than 18 U.S.C. § 1512(a)(1)(C) as the underlying predicate felony offense.[2] "A criminal defendant is entitled to an instruction on a lesser-included-offense if: (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) the evidence would support a conviction on the lesser offense; and (4) the proof on the element or elements differentiating the two crimes is sufficiently disputed so that a jury could consistently

---

[2] The § 373 count appears in full in the previous section of this opinion.

acquit on the greater offense and convict on the lesser." *United States v. Colon*, 268 F.3d 367, 373

(6th Cir. 2001).

> Here, the two statutory provisions read in part as follows:

> Whoever *kills or attempts to kill* another person with intent to . . . prevent the communication by any person to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense . . . .

18 U.S.C. § 1512(a)(1)(C) (emphasis added).

> Whoever knowingly *uses intimidation, threatens, or corruptly persuades* another person, or attempts to do so, or engages in misleading conduct towards another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense . . .

18 U.S.C. § 1512(b)(3) (emphasis added).

Because the offense of conviction, 18 U.S.C. § 373, requires "the use, attempted use, or

threatened use of physical force against . . . the person of another," § 1512(b)(3) can only serve as

a predicate offense if we conclude that using intimidation, threats, or corrupt persuasion falls within

that definition. We conclude that it does not because § 1512(b)(3) does not require the use of

physical force. It is not surprising, therefore, that defense counsel failed to produce a single case

in support of his proposed lesser included offense instruction, nor has our own independent research

revealed any instance in which § 1512(b)(3) was charged as the predicate in a § 373 count.

Under the circumstances, the district court did not abuse its discretion in declining to instruct

the jury with respect to § 1512(b)(3).

**I. Defendant's Sentence**

Finally, defendant contends that his sentence of 35 years of imprisonment was "unreasonable" as that term is understood in the post-*Booker* universe. *United States v. Booker*, 543 U.S. 220 (2005). In the wake of *Booker*, the federal sentencing guidelines are advisory and the district court must consider the factors set forth in 18 U.S.C. § 3553(a) when imposing a sentence. "A sentence may be unreasonable 'when the district judge fails to "consider" the applicable guidelines range or neglects to "consider" the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such consideration.'" *United States v. Chander*, 419 F.3d 484, 486 (6th Cir. 2005) (quoting *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005)). However, the trial court need not engage in a "ritualistic incantation" of the factors set forth in § 3553(a) when imposing a sentence. *Id.* at 388.

In this case, the pre-sentence report was completed on December 22, 2004 with sentencing scheduled for January 24, 2005. Although defendant's criminal history was only Category I, the severity of his offenses resulted in an adjusted offense level of 51, which calls for a sentence of life imprisonment. However, *Booker* was decided between the preparation of the pre-sentence report and sentencing.

At the sentencing hearing, the district court made clear to counsel that *Booker* had altered the legal landscape and that it would not take into account all of the relevant conduct with respect to drug quantity considered in the pre-sentence report. As it observed, the government "charged only the 75 kilograms of cocaine . . . [and] [t]his defendant was not charged with conspiracy." However, the court overruled defendant's objections to other guidelines enhancements, such as three points for assault of law enforcement officers and four points for role in the offense.

After noting that it found the guidelines helpful to the extent that "they make you think about all the various pieces of an offense that might make it more aggravated or less aggravated in any particular case," it mentioned the factors set forth in 18 U.S.C. § 3553(a). The court then acknowledged that the guidelines were "just one of those [statutory] factors" to be considered before turning to defendant's request for a downward departure. Defense counsel urged the court to consider a sentence "somewhere between about 28 years up to about 34 or 35 years" based upon defendant's youth (he was 24 at the time of sentencing) and lack of prior convictions. The court responded in these terms:

> The court has considered everything that's been said and everything that has been filed here. And it seems to me that an appropriate sentence in this case is 35 years on Count One, which is 420 months, to be followed by 240 months on Count Two, to run concurrent with Count One; and 240 months on Count Three, to run concurrent with Count One.
>
> These are the reasons for my sentence. And I will say that the total offense level given my prior rulings is 49, criminal history category "I," and the guideline range does result in a life sentence.
>
> And these are the reasons for not giving a life sentence. First of all, despite the fact that the guideline range is determined in part by criminal history of the particular defendant, under the statute the history and characteristics of the defendant is a separate consideration, and the court is still very struck with the fact that Mr. Gomez is basically a first offender. . . .
>
> He is 24. He had an alcohol abuse problem since the age of 13. The pre-sentence report says that he drank a 12-pack of beer every other day and a fifth of rum or whiskey on the weekends. He has used marijuana since the age of 12 every three to four days; cocaine since the age of 18; heroin, Ecstasy.
>
> He obviously has an extremely serious alcohol and drug dependence problem . . . .

The court went on to note that defendant did not "live like a king" while dealing drugs and had shown the "beginning of what I think will be a sincere change of heart." Finally, it observed that a 35-year sentence would send "a strong message in terms of deterrence of criminal conduct."

Given that defendant faces exposure to a potential life sentence and that the term he received fell within the range that his counsel requested, it is somewhat surprising that he raises a challenge to his sentence at all. That consideration aside, it is clear to us that the district court approached defendant's sentencing in precisely the manner required by *Booker*: it considered the guidelines as advisory; made no inappropriate factual findings; and considered the public policy points embraced in 18 U.S.C. § 3353(a). For those reasons, defendant's sentence is "reasonable" and must be affirmed.

**III.**

The judgment is **affirmed**.