## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-60365

United States Court of Appeals
Fifth Circuit

**FILED**
May 28, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

CARL NICHOLSON,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before OWEN, Chief Judge, and SOUTHWICK and OLDHAM, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

The defendant appeals his convictions on eleven federal tax offenses, arguing the Government used an improper summary witness, the trial evidence was insufficient to sustain the convictions, and cumulative errors warrant reversal. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Carl Nicholson was a certified public accountant, or CPA. In 1977, he purchased an accounting firm which, from 2012 to 2015, was called

No. 19-60365

Nicholson & Company.  In 2015 Nicholson's partners purchased his interest in the firm, and it became known as TMH.

In 2018, Nicholson was charged in an 11-count superseding indictment. Count I alleged Nicholson conspired to commit tax fraud in violation of 18 U.S.C. § 371.  Counts II–V alleged Nicholson filed false tax returns for himself in violation of 26 U.S.C. § 7206(1).  Counts VI–XI alleged Nicholson aided and assisted in the preparation of false tax returns in violation of 26 U.S.C. § 7206(2).

A jury convicted Nicholson on all counts.  His legal issues on appeal concern the evidence, either that some of it was improperly introduced under the guise of being mere summaries of other evidence, or that it was insufficient for conviction of various counts.  The following factual discussion is lengthy, presented in a manner to assist the understanding of groups of counts in the indictment.  Our legal analysis will draw significantly on this factual discussion without substantial restating of the evidence.

## I.     *Lee's individual returns and JLPA's corporate returns*

Nicholson prepared federal individual income tax returns for attorney John Lee and financial statements and federal corporate income tax returns for Lee's law firm, John W. Lee, Jr., P.A. ("JLPA").  The following identifies the claimed falsities.

### A.     *Lee family trusts and life insurance policies*

Nicholson & Co. prepared tax returns for two trusts Lee had established for his family, which were prepared by attorney Robert Jackson.  Lee used JLPA's corporate account to write checks with a blank "for" line and payable to Jackson for the purpose of depositing into the trusts' bank accounts, which Jackson did.  Jackson used money in the trusts' bank accounts to pay the Lee family life insurance premiums.

2

No. 19-60365

Dawn Jones, a CPA and partner at Nicholson & Co., was assigned to Lee's account. Typically, Lee would provide information regarding the purpose of his expenses directly to Jones. In July 2012, though, while Jones was preparing the Lee family trusts' returns, she noticed the "for" line was blank on check #6223. This check was one Lee had made payable to "Robert T. Jackson, Trustee" for the purpose of depositing into a Lee-family-trust bank account. Jones asked Nicholson the purpose of the check, and in response, Nicholson sent her an email with the subject line "Check to Jackson." It stated, in its entirety: "Legal fees per John Lee." Jones entered a note on the email, which stated: "This e-mail was in response to the classification of Ck no 6223 dated 5-7-12 [for] $250,000 recorded to Associate Fees Paid. Per this e-mail, that classification is correct." Jones did not know the checks from JLPA's corporate account, made payable to Jackson, were for insurance premium payments for the Lee family trusts. Because Jones categorized the payment as a corporate deduction, it was not reported in Lee's 2012 individual income tax return. Lee told Nicholson that the characterization of check #6223 as a business expense was a "glaring error," to which Nicholson responded, "this is the only way we can do it to save you taxes" and, "only you and I will know."

Even though Nicholson did not provide additional specific instructions every year, Jones continued to rely on Nicholson's 2012 instructions in future years, using the same process for future checks from JLPA to Jackson. JLPA made payments to Jackson in this manner in 2012, 2013, and 2014; each year, Nicholson & Co. recorded these payments, bound for the Lee family trusts, as corporate deductions in JLPA's tax returns. The payments were not included as income in Lee's individual returns.

A recording of a conversation with Nicholson describing the arrangement was played at trial. In the recording, Nicholson stated that Lee "would write a check out of the PA . . . to Robert Jackson," that "Robert knew it was for him

No. 19-60365

[to] pay the life insurance premiums as trustee of the trust," and that Lee "wrote that off as legal fees, knowing that it wasn't legal fees." Nicholson stated this occurred "every year," for "10, 15 years," and Lee took deductions "[f]or legal fees, which is false."

B.    *JLPA's $66,000 in payments to Nicholson*

In 2014, Nicholson told Lee that JLPA owed Nicholson & Co. for accounting work. Lee did not agree, but he wrote five checks totaling $66,000 from JLPA's corporate account payable to "Carl Nicholson." Three of the checks had a blank "for" line, and two of them stated "Accounting" on the "for" line. Lee testified that he said to Nicholson:

> Carl, you're claiming I owe you this money for your office, and I'm going to pay you, but I'm paying you with my office check, it's not a personal check, and you need to make sure that that's shown by your company as an accounting expense that I am paying to your firm.

Frank McWhorter, a CPA and managing partner at THM (formerly Nicholson & Co.), testified that Nicholson & Co. and JLPA had an agreement whereby Nicholson & Co. would not charge JLPA for accounting services because JLPA referred business to Nicholson & Co. According to McWhorter, the $66,000 in payments from JLPA to Nicholson were never received by Nicholson & Co.

Nicholson deposited three of the checks, totaling $55,000, into a personal bank account. The payments, which had been categorized as "accounting" expenses or "legal and professional" expenses in JLPA's general ledger, were deducted on JLPA's 2014 corporate tax return. Nicholson signed this tax return as the paid preparer.

II.    *Nicholson's individual income tax returns*

   A.    *Forrest General Hospital consulting contract*

Nicholson had a consulting agreement with Forrest General Hospital ("FGH") under which FGH paid Nicholson $2,083 per month for business advice from May 2012 through the end of 2015 using checks made payable to "Carl Nicholson." Until August 2015, Nicholson would cash the FGH payments himself. Nicholson reported the payments as Nicholson & Co.'s income or as "rents received" in his returns from 2012 to 2015. Consequently, Nicholson's personal return showed no income from FGH, thereby reducing his tax liability. Nicholson & Co. did not receive any FGH payments and did not record them as income on Nicholson & Co.'s returns.

Nicholson & Co. employee Becky Boone, who assisted Nicholson with filing his 2012–2014 individual returns, testified that Nicholson had instructed Boone to indicate in these returns that the FGH payments had been received by Nicholson & Co. because they were related to "company business." Marcia Wright, who was a CPA for a different accounting firm, testified that in her work on Nicholson's personal 2015 return, she listed the FGH payments as having been received by Nicholson & Co. because Nicholson, in writing, had instructed her to do so.

   B.    *Reimbursements from Nicholson & Co. to Nicholson*

Nicholson & Co. employees would use personal credit cards for business reasons and later seek reimbursement from Nicholson & Co. To receive reimbursements, employees and partners would submit expense reports indicating the date, time, and nature of the expense, with receipts attached. Reimbursement required partner approval and partners could not approve their own reimbursements.

From August 2013 to July 2014, Nicholson submitted reimbursement requests merely stating "Amex" with an amount requested but with no

description or receipts. These reimbursement requests matched charges on Nicholson's American Express ("Amex") account.

From July 2014 to 2015, Nicholson submitted reimbursement requests with no descriptive information on the reimbursement request form itself but with attached Amex statements noting which expenses were requested for reimbursement. These charges, reimbursed to Nicholson with Nicholson & Co. funds, included charges associated with a concierge medical service, personal legal expenses, subscriptions to a sports publication, and family travel.

According to McWhorter, a number of expenses charged to Nicholson's Amex card and reimbursed to Nicholson were not in compliance with Nicholson & Co.'s reimbursement policy. McWhorter also testified that whether a charge was properly authorized as reimbursable might depend on who was interpreting the reimbursement policy. The reimbursement payments were not recorded on Nicholson's 2013, 2014, or 2015 individual returns.

C.    *JLPA's $66,000 in payments to Nicholson*

The treatment of JLPA's $66,000 in payments to Nicholson, in addition to its effect on the accuracy of JLPA's returns, affected the accuracy of Nicholson's individual returns. As previously explained, in 2014 Nicholson told Lee that JLPA owed Nicholson & Co. for accounting work. Lee disagreed, but he still made out checks totaling $66,000 from JLPA's corporate account, payable to "Carl Nicholson." Nicholson & Co. and JLPA had an agreement whereby Nicholson & Co. would not charge JLPA for accounting services. The $66,000 in payments from JLPA to Nicholson were never received by Nicholson & Co. Nicholson deposited three of the checks, totaling $55,000, into a personal bank account. The payments were not recorded as income in Nicholson's 2014 individual income tax return.

### D.    *Nicholson's 2015 adjusted basis in Nicholson & Co., when Nicholson's partners bought out Nicholson's interest*

In 2015, Nicholson & Co. partners bought out Nicholson's interest in the company.  In calculating Nicholson's taxable profit from the sale of his interest, Nicholson had to calculate his adjusted basis in the company, *i.e.*, the amount he paid to acquire his interest plus contributions to, or expenditures of Nicholson's own funds on behalf of, the company.  Once Nicholson determined his adjusted basis, he could calculate his gain or loss from the sale of his interest by taking the difference between his adjusted basis and the amount he was paid for his interest in 2015.  Thus, if Nicholson's adjusted basis was higher, his taxable income would be lower.

In emails between Wright and Nicholson regarding Nicholson's 2015 return, Nicholson told Wright to use $450,000 as the figure for his adjusted basis in Nicholson & Co.  This figure was a combination of Nicholson's purported $150,000 initial payment for his interest in the company and $300,000 in payments Nicholson told Wright that Nicholson had made on the company's behalf.  Despite a request from Wright, Nicholson never provided documentation to support his adjusted basis figure.  Instead, Nicholson emailed Wright, "Marcia, I have reviewed [my] basis over a 35 year period and have conferred with other people and feel comfortable with $450,000 outside basis.  The remainder of the return is good and I am pleased."

Typically, Wright would have contacted Nicholson & Co. directly for an explanation or confirmation of Nicholson's purported adjusted basis, but Nicholson told Wright that Wright was not to contact the company regarding anything.  In an email to a colleague working on the matter, Wright stated, "we've decided to keep all these emails, use the $450,000 and go.  I don't like anything about this basis bit anyway."  In the end, Wright filed Nicholson's

No. 19-60365

2015 return using the $450,000 figure for his adjusted basis in Nicholson & Co., reducing his 2015 taxable income.

According to McWhorter, Nicholson never made the purported payments on Nicholson & Co.'s behalf. Further, Nicholson's personal financial statements from 2012, 2014, and 2015 indicated his initial investment in Nicholson & Co. had been $100,000, not $150,000.

\* \* \*

After a four-day trial, the jury found Nicholson guilty on all counts. The district court sentenced him to 60 months of imprisonment and three years of supervised release, and the court ordered payment of restitution. Nicholson's motion for a new trial was denied, and this timely appeal followed.

## DISCUSSION

Nicholson raises three challenges on appeal. We will discuss them in the following order: (I) whether admitting summary testimony and charts constituted reversible error, (II) whether the trial evidence was insufficient to sustain his conviction, (III) whether certain alleged errors, considered cumulatively, require reversal.

### I.    *Summary evidence*

The Government's final witness was IRS Agent Bradley Luker, who testified as a summary witness and as a fact witness regarding his investigation into Nicholson's tax returns. During his testimony, the Government introduced charts showing summaries of Nicholson's tax returns for 2012 to 2015 and Amex reimbursement requests. Before jurors began their deliberations, the district court instructed them that "summary charts and witnesses are no better than the underlying testimony and the documents upon which they are based and are not themselves independent evidence."

No. 19-60365

This court reviews admission of summary evidence for abuse of discretion. *United States v. Baker*, 923 F.3d 390, 396 (5th Cir. 2019). Even if admission of summary evidence was error, the error "is excused unless it had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* A proponent of evidence "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." FED. R. EVID. 1006. This court "expressly allows summary witnesses to summarize voluminous records in complex cases." *Baker*, 923 F.3d at 397. Summary witness testimony, though, cannot organize the case for the jury, substitute for closing argument, *id.*, or introduce evidence the jury has not previously heard, *United States v. Nguyen*, 504 F.3d 561, 572 (5th Cir. 2007).

Nicholson argues Luker's summary testimony was impermissible because it was improper "expert-type testimony." According to Nicholson, it was improper for Luker, who was not offered as an expert and was not a CPA, to state his conclusions about whether Nicholson's income tax returns were "false" and what the "correct" amounts should have been. Nicholson analogizes the facts here to a case where a summary witness provided testimony that did "far more than summarize" previously presented evidence, but instead offered supplemental expert testimony. *See United States v. Hart*, 295 F.3d 451, 458–59 (5th Cir. 2002). In that decision, we recognized that the government, through its summary witness, had introduced a chart as "summary" evidence even though the chart "assum[ed] that which [the government] was required to prove beyond a reasonable doubt as operative facts of the alleged offense." *Id.* at 459. Essentially, the government had been permitted to introduce evidence that filled in holes necessary for the government's case, which surely was not summary evidence at all. The alleged summary evidence was essential to the government's evidentiary obligation; admission of the evidence thus had

a substantial and injurious effect on the jury's verdict.  We concluded that admitting the evidence was reversible error.  *Id.*

What a summary witness properly can do is "read[] the contents of exhibits and sort[] through the evidence to show how the documents related to each other and to the charges in the indictment."  *Baker*, 923 F.3d at 398. Further, this case is not like *Hart*, where the summary witness's testimony addressed evidence not yet introduced.  *Hart*, 295 F.3d at 458–59.  Luker's testimony and summary charts were derived from the evidence that had already been introduced, namely, earlier testimony, tax return documents, and bank account records.

Nicholson argues that Luker's testimony conflicted with testimony of other witnesses.  According to Nicholson, Luker's testimony that $66,000 in payments from JLPA to Nicholson was not for accounting services conflicts with Lee's testimony that the payments were for accounting services. Regarding evidence of Nicholson's adjusted basis in Nicholson & Co., Nicholson argues Luker "strongly insinuate[ed]" the $450,000 figure Nicholson provided to Wright was false, and that, contrary to Luker's testimony, McWhorter did not "confirm" that Nicholson's initial payment for his interest was $150,000.

We find, though, that Luker's testimony did not conflict with earlier testimony.  Nicholson & Co. never received any of JLPA's $66,000 in payments. Nicholson deposited a large portion into a personal bank account.  Nicholson never reported them as income on his individual income tax returns.

As to Lee, he never testified that the payments were actually for accounting services.  Indeed, Lee testified that he did not agree with Nicholson's insistence that JLPA owed Nicholson or Nicholson & Co. any money for accounting services.  Lee's testimony was that Nicholson needed to record the payments as accounting services, which supports the conspiracy charge in Count I.  Nicholson also argues that Lee's testimony, which he

incorrectly argues supports his innocence, was the sole testimony addressing the reason for the checks from Lee. This is incorrect. McWhorter testified that Nicholson & Co. and JLPA had an agreement that Nicholson & Co. would not charge JLPA for accounting services because JLPA referred business to the company. This supports the conclusion that the payments were not for accounting services. There was also other evidence that the payments were not for accounting services, and that Nicholson deposited a large portion of the payments into a personal bank account.

In sum, Luker's testimony regarding the payments did not conflict with Lee's testimony or other evidence previously admitted about these payments.

Regarding Luker's testimony about Nicholson's adjusted basis in Nicholson & Co., Luker never stated Nicholson's claimed adjusted basis figure, $450,000, was false. As to whether McWhorter "confirmed" Nicholson's purported $150,000 initial payment for his interest, McWhorter did testify: "I recall it being $150,000." Luker's testimony did not conflict with this. Luker did explain, though, that Nicholson's financial statements, which had already been entered into evidence, showed the "cost" of Nicholson & Co. as $100,000.

Nicholson also argues that Luker offered improper "*opinions* based on the *opinions* . . . of McWhorter." (emphasis in original). According to Nicholson, because McWhorter testified that whether a charge was deemed reimbursable might depend on who was interpreting the reimbursement policy, McWhorter's testimony was a mere "opinion" that the expenses were not reimbursable. Thus, Nicholson argues, Luker's testimony that certain portions of Nicholson's reimbursed expenses should not have been authorized for reimbursement, and so should have been recorded as income on Nicholson's individual returns, improperly "bolstered" McWhorter's earlier testimony.

We see this as a splitting of semantic hairs. McWhorter reviewed Nicholson's Amex charges and indicated which ones should not have been

11

reimbursed as business expenses. This included expenses associated with concierge medical services, personal legal expenses, a family trip, and subscriptions to sports publications. There is no dispute Nicholson did not record these reimbursement payments as income in his individual returns for 2013, 2014, or 2015. As the managing partner of Nicholson & Co. at the time Nicholson submitted the reimbursement requests, McWhorter was qualified to testify as to whether the expenses should have been authorized for reimbursement. Luker's reference to McWhorter's testimony was not improper "bolstering."

Nicholson's final summary evidence argument is that Luker's testimony amounted to improper "additional closing argument." Unlike the cases upon which Nicholson principally relies, though, Luker's testimony did not "simply recap" the Government's case-in-chief, *United States v. Fullwood*, 342 F.3d 409, 413 (5th Cir. 2003), and it did not put an "unfair spin" on earlier testimony, *United Sates v. Castillo*, 77 F. 3d 1480, 1500 (5th Cr. 1996). Luker's testimony illuminated previously admitted evidence related to tax and accounting concepts not easily observable to the jury. Nicholson's counsel cross-examined Luker and had the opportunity to put on evidence regarding the topics Luker discussed. The only reason Luker was the last witness to testify was that Nicholson chose not to present a case-in-chief. Thus, Luker's testimony was not impermissible "additional closing argument."

Even if there were some error in admitting Luker's testimony or charts, it was harmless. The Government introduced substantial evidence of Nicholson's guilt on every count. If Luker had not testified, that evidence still would have been in the record. Luker's testimony and charts had no discernable effect on the quantum of evidence before the jurors, but it did ease their task in correlating all this information.

No. 19-60365

The district court correctly recognized that "this case involved accounting concepts, nuances of tax law, and business arrangements outside the experience of most jurors."  Luker's testimony and charts were based on already-admitted evidence and the district court instructed the jury on how to properly consider such summary evidence.  Admitting this evidence was not an abuse of discretion.

## II.    *Sufficiency of evidence to sustain convictions*

Where, as here, a defendant has timely moved for a judgment of acquittal, this court reviews challenges to the sufficiency of the evidence *de novo*.  *United States v. Perez-Ceballos*, 907 F.3d 863, 866–67 (5th Cir. 2018).  "Though *de novo*, this review is nevertheless highly deferential to the verdict."  *United States v. Tinghui Xie*, 942 F.3d 228, 234 (5th Cir. 2019).  Because of the shortcomings inherent in examining a "cold appellate record without the benefit of the dramatic insights gained from watching the trial," we review the "evidence and all reasonable inferences in the light most favorable to the prosecution" and to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United Sates v. Vargas-Ocampo*, 747 F.3d 299, 301, 303 (5th Cir. 2014).

### A.    *Charges related to Lee's and JLPA's tax returns*

The elements of a conspiracy under 18 U.S.C. § 371 are "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy."  *Tinghui Xie*, 942 F.3d at 240.  The elements of aiding and assisting in filing a false tax return under 26 U.S.C. § 7206(2) are (1) the "defendant aided, assisted, counseled, or advised another in the preparation of the tax return in

13

question; (2) the tax return contained a statement falsely claiming income, deductions, or tax credits; (3) the defendant knew that the statement was false; (4) the false statement was material; and (5) the defendant acted willfully." *United States v. Morrison*, 833 F.3d 491, 500 (5th Cir. 2016). Under Section 7206(2), a defendant does not have to sign or personally prepare the return to be subject to conviction. *See id.* at 501.

Nicholson argues the Government failed to establish these elements because (1) Lee testified that JLPA's $66,000 in payments to Nicholson were for accounting services, so they were not "false"; and (2) other Nicholson & Co. employees, not Nicholson himself, prepared Lee's and JLPA's tax returns, so Nicholson did not "know" of any alleged falsity.

First, to recap, there was evidence showing the payments from JLPA to Nicholson were not in fact for accounting services. Lee and McWhorter both testified that they understood JLPA did not owe Nicholson & Co. for accounting services. Despite this, Lee wrote checks from JLPA to "Carl Nicholson," while insisting that Nicholson & Co. record the payments as "accounting expenses." Nevertheless, Nicholson deposited a large portion of these payments into his personal bank account. Nicholson & Co. did not receive any of those payments. Further, JLPA's 2012, 2013, and 2014 tax returns indicated that payments to Jackson were for "legal fees" when in fact they were for Lee's family trust. A rational jury could have found beyond a reasonable doubt that JLPA's 2012, 2013, and 2014 tax returns were indeed false. The same applies to Lee's individual income tax returns, which did not indicate the payments from JLPA to the Lee family trusts as income to Lee. This was sufficient to show Lee's individual income tax returns contained false statements.

Second, Nicholson instructed Jones to categorize the payments from JLPA to the Lee family trusts as "legal fees per John Lee." An audio recording was played for the jury in which Nicholson stated that Lee "wrote that off as

legal fees, knowing that it wasn't legal fees," and that Lee took deductions "[f]or legal fees, which is false." This and the deposit of the JLPA payments into Nicholson's personal bank account were enough for a rational jury to find beyond a reasonable doubt that Nicholson had knowledge of the falsehoods contained in Lee's and JLPA's tax returns. The fact that Nicholson was not the signed preparer on the tax returns does not mean Nicholson had no knowledge of the falsehoods contained in them. *See Morrison*, 833 F.3d at 501. The evidence was sufficient to sustain Nicholson's convictions on the charges related to Lee's and JLPA's tax returns.

### B.     *Charges related to Nicholson's individual income tax returns*

The elements of filing a false tax return under 26 U.S.C. § 7206(1) are that a defendant "(1) made and signed a materially false federal income tax return; (2) submitted a written declaration stating under penalties of perjury that the return was true and correct; (3) did not believe that the return was true and correct when he signed it; and (4) signed it willfully and with the specific intent to violate the law." *United States v. Boyd*, 773 F.3d 637, 644 (5th Cir. 2014) (citing § 7206(1)).

Nicholson's individual income tax return documents and Wright's and McWhorter's testimony were sufficient to support a finding that Nicholson falsely stated in his 2012 to 2015 individual income tax returns that the FGH income was an offsetting expense because it had been received by Nicholson & Co. Nicholson & Co. did not receive any FGH payments and did not record them as income on Nicholson & Co.'s tax returns. Further, Nicholson's 2014 individual income tax return did not indicate the portions of JLPA's $66,000 in payments which Nicholson had deposited into a personal bank account, and Nicholson's individual income tax return documents and Amex statements and McWhorter's testimony support a finding that Nicholson did not report reimbursement payments as income in his 2013 to 2015 individual income tax

returns which should have been reported as such. Finally, a rational jury could find that the evidence of Nicholson's individual income tax return documents and Wright's and McWhorter's testimony regarding Nicholson's adjusted basis in Nicholson & Co. showed beyond a reasonable doubt that Nicholson knowingly stated a false adjusted basis in his 2015 tax return. The evidence was sufficient to sustain a conviction on every count.

### III.    *Possible cumulative error*

Under the doctrine of cumulative error, "an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012). Reversal is justified when the errors, considered cumulatively, violate the trial's fundamental fairness. *Id.* Though this is possible in theory, arguments for cumulative error are "practically never found persuasive." *United States v. De Nieto*, 922 F.3d 669, 681 (5th Cir. 2019).

Nicholson argues alleged errors involving summary testimony, admission of a draft tax return, and comments from Lee regarding grand jury testimony and from Wright regarding burden of proof, when all considered cumulatively, require reversal. As explained, Luker's testimony and the charts were permissible. The admission of a draft tax return to show the materiality of the change in Nicholson's adjusted basis in Nicholson & Co. was similarly not an error because it related to the materiality of the change in adjusted basis. As to these arguments, there is no error to cumulate. *See Delgado*, 672 F.3d at 343–44. Any error arising from the comments by Lee and Wright were cured by the jury instructions that we discuss next.

Finally, there were certain comments made at trial which Nicholson alleges violated its fundamental fairness. At the end of the Government's case, the district court told jurors they would next hear Nicholson's defense, at which

time defense counsel would call witnesses.  Outside the presence of the jury, Nicholson's counsel moved for a mistrial, arguing that the district court had implied to jurors that Nicholson was obligated to present a defense case.  The district court denied the motion.  Upon the jury's return, the court gave the following instruction: "I misspoke . . . when I sent you out.  On Monday I told you . . . in my instruction that the defendant is allowed to but not required to call any witnesses, and that's . . . the defendant's right. . . .  [N]ow I'm going to offer to the defendant the right to present his case-in-chief."

Nicholson's defense counsel rested without calling witnesses.  Before the jury began deliberations, the district court instructed the jury that "the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence" and that "summary charts and witnesses are no better than the underlying testimony and the documents upon which they are based and are not themselves independent evidence."

We conclude that the district court's erroneous comments at the end of the prosecution's case were cured by specific jury instructions, which we presume the jury followed.  *See United States v. Reed*, 908 F.3d 102, 115 n.42 (5th Cir. 2018).

AFFIRMED.